UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

MARIAN V. BUTCHER,                    )
                                      )
            Plaintiff,                )
                                      )
v.                                    )        No.:   3:22-CV-410-TAV-JEM
                                      )
UCW-CWA LOCAL 3865 and                )
COMMUNICATIONS WORKERS                )
OF AMERICA,                           )
                                      )
            Defendants.               )

## <u>MEMORANDUM OPINION</u>

Before the Court are defendants' motion for summary judgment [Doc. 34] and

plaintiff's motion for joinder [Doc. 37]. The motions have been fully briefed [Docs. 35,

38, 50, 51, 52], and are ripe for review. *See* E.D. Tenn. L.R. 7.1(a). Plaintiff also filed a

motion for leave to file a surreply to defendants' summary judgment motion [Doc. 53], to

which defendants have not responded. For the reasons that follow, defendants' motion for

summary judgment [Doc. 34] is **GRANTED**, and plaintiff's motion for joinder [Doc. 37]

is **DENIED**. In so holding, the Court has considered plaintiff's surreply [Doc. 54].

Accordingly, plaintiff's motion for leave to file a surreply [Doc. 53] is **GRANTED**, and

defendants' motion to continue trial [Doc. 56] is **DENIED as moot**. This case will be

**DISMISSED**.

# I.    Material Facts[1]

## A.    Background on the Parties

This lawsuit arises from the termination of plaintiff's employment as a West Tennessee staff organizer with UCW-CWA Local 3865 (the "Local"), a labor organization that represents employees in public and private higher education institutions in Tennessee [Doc. 36-2, pp. 1, 9; Doc. 36-1, pp. 2, 4; Doc 36-4, p. 1; Doc. 36-3, p. 1]. Plaintiff, a black female, was hired by the Local in July 2020 and was discharged on December 22, 2020[2] [Doc. 36-4, p. 4; Doc. 36-1, p. 59; Doc. 36-1, p. 59; Doc. 36-2, pp. 1, 9; Doc. 36-1, p. 4].

Seventy-five percent of plaintiff's salary came from the organizing budget of Communications Workers of America ("CWA"), while the remaining 25% was funded by the Local [Doc. 36-1, p. 6; Doc. 36-2, p. 9; Doc. 36-3, p. 1]. CWA is an international labor organization that supports the organizing efforts of local union affiliates by providing funding for local unions to hire their own staff [Doc. 36-3, pp. 1–2]. CWA approves and provides such funding where the local union's organizing plan justifies the investment of CWA resources [*Id.* at 2]. Among the local unions that have received such funding is the Local, which is an affiliate of CWA's United Campus Workers ("UCW") [*Id.*].

In July 2020, the Local submitted an organizing proposal to CWA to help fund three organizer positions—two in West Tennessee and one in East Tennessee—the salaries of

---

[1] The Court only includes facts necessary to its analysis of defendants' motion. The facts are construed in the light most favorable to plaintiff when supported by admissible evidence. *Godawa v. Byrd*, 798 F.3d 457, 463 (6th Cir. 2015).

[2] Unless otherwise specified, all subsequent dates herein occurred in 2020.

2

each to be funded 75% by CWA and 25% by the Local [*Id.* at 2; Doc. 36-1, pp. 7, 9; Doc. 36-2, p. 9]. The two West Tennessee positions had an organizing goal of 100 new members for the upcoming year [Doc. 36-3, p. 2; Doc. 36-1, p. 8; Doc. 36-2, p. 8 ("100 [new members] in West TN")]. Consistent with this yearly goal, Thomas Smith, Senior Director of Organizing of the CWA, stated in a declaration that the Local proposed to him a West Tennessee organizing goal of 10 new members per month [Doc. 36-3, p. 2]. This is less than what was stated in plaintiff's offer letter, which provided that her job duties included "aiming to sign up 15 new members per month" [*Id.* at 1; Doc. 50-2, p. 1]. Meanwhile, the East Tennessee organizer position had a yearly goal of recruiting 50 new members [Doc. 36-3, p. 2; Doc. 36-2, p. 8].

Mr. Smith, on behalf of CWA, approved funding for these three positions subject to the organizers meeting their performance goals [Doc. 36-3, p. 2].[3] Thereafter, plaintiff and Henry Jones were hired to serve in West Tennessee, and Eli Stanfield was hired in East Tennessee [*Id.* at 2–3; Doc. 36-1, pp. 2, 22, 52; Doc. 36-2, pp. 8–9].

Despite the funding arrangement between CWA and the Local, Josh Smyser, Vice President of the Local, asserts that the Local operates as a separate labor organization from CWA and is governed by its own bylaws [Doc. 36-4, p. 1]. Plaintiff disputes this fact,

_____

[3] In response to their motion, plaintiff claims she was unaware of any such requirement, and that this gives rise to a genuine dispute of fact [Doc. 50, p. 4]. In reply, defendants assert that they do not submit that the requirement was a contract term of plaintiff's employment with the Local [Doc. 52, p. 7]. However, they maintain that it is undisputed that 75% of plaintiff's salary, which was funded by CWA, was conditioned on her meeting performance goals [*Id.*]. Consequently, they argue that plaintiff's lack of awareness is not material, and they further note that, as discussed *infra*, it is undisputed that plaintiff did not come close to signing up 15 new members per month, as set forth in her offer letter [*Id.*].

3

pointing to CWA's Constitution, which provides that CWA is governed in part by "the Locals of the Union conducting their affairs in accordance with this Constitution and Local Bylaws and Rules which they may adopt so long as they do not contravene any provision of this Constitution" [Doc. 50-1, p. 5]. Plaintiff construes this language to mean that the Local is subject to CWA and its governing documents [Doc. 50, p. 2]. She further notes the interconnectedness between the two organizations and contends that CWA staff "regularly and integrally" performed the "'work of the Local'" [*Id.* at 2]. In support, she cites to the fact that her supervisor, Karly Safar, was an employee of CWA [*Id.*; *see also* Doc. 36-2, p. 2]. According to plaintiff, that CWA funded 75% of her salary gives rise to a genuine dispute of fact as to defendants' claim that the Local was plaintiff's "sole and exclusive employer" [Doc. 50, p. 3].

As to the Local's operations and affairs, they were overseen by an executive board consisting of four elected officers, three elected area representatives, and another individual [Doc. 36-4, pp. 1–2]. According to Mr. Smyser, the board members were not employed by the Local, and as a result, they performed their duties as board members "strictly as volunteers" and did not receive any salary, wages, or stipend from the Local [*Id.* at 2]. Finally, the Local did not employ more than six paid staff during Mr. Smyser's tenure as the Vice President from 2017 through the end of 2020 [*Id.*].

### B. The Scheduling Conflict

The Local scheduled its annual convention on September 19, which coincided with the observance of the Rosh Hashanah holiday [Doc. 36-1, pp. 7–8]. Plaintiff became aware that other staff members, at least one of whom was Jewish, were upset about the scheduling

4

conflict [*Id.* at 7–8, 10–11].  She also learned that others[4] were unsuccessful in their efforts to convince Mr. Smyser to change the date [*Id.* at 8–9].

Accordingly, plaintiff, who is of the Christian faith and not Jewish, discussed the matter with Mr. Smyser in early September, in an attempt to appeal to him as a "fellow Christian" [*Id.* at 11–13; *see also* Doc. 36-4, p. 3].  She recalled telling him that it was inappropriate to schedule the convention during a major Jewish holiday and that members and staff were upset [Doc. 36-1, pp. 12, 14].  Plaintiff testified that Mr. Smyser told her it was too late to change the date, as it would inconvenience others [*Id.* at 14].  Plaintiff described the conversation with Mr. Smyser as "very tense" [*Id.* at 12].

Following their conversation, Mr. Smyser circulated an email stating that, after speaking with plaintiff and others, changing the convention to another date "seem[ed] like a good option" [*Id.* at 15; Doc. 36-2, p. 10; Doc. 36-4, p. 3].  He also invited feedback about the proposed rescheduling [Doc. 36-2, p. 10].  According to Mr. Smyser, the executive board subsequently decided to move the convention so as to not conflict with Rosh Hashanah [Doc. 36-4, p. 3].[5]

---

[4] Although plaintiff submits that the exact number of individuals who spoke to Mr. Smyser about rescheduling the convention is "entirely relevant," the Court respectfully disagrees, as it is not material under applicable law [Doc. 54, p. 3].  Further, plaintiff cites to a number of allegations in her complaint [*see id.*].  But, as discussed *infra*, plaintiff cannot rely on these allegations as evidence to avoid summary judgment.

[5] Plaintiff perceives an inconsistency between the statements made in Mr. Smyser's declaration and his email, and she submits that this amounts to a genuine dispute of fact [Doc. 50, pp. 5–6; *see also* Doc. 52, p. 2].  However, the Court fails to see any inconsistency, especially one that is material to its religious discrimination analysis.  Ultimately, plaintiff does not dispute that the Local rescheduled the convention.

5

## C.    Plaintiff's Complaint about Henry Jones

Mr. Jones, a black male, was the second organizing staff member employed by the Local in West Tennessee alongside plaintiff [Doc. 36-1, pp. 2, 22, 52].  Like plaintiff, 75% of Mr. Jones' salary was funded by CWA [Doc. 36-2, p. 9; Doc. 36-3, p. 2].  Plaintiff was responsible for recruiting at the University of Memphis and LeMoyne-Owen College, and Mr. Jones recruited from the University of Tennessee Health Sciences Campus and Tennessee State University [Doc. 36-1, pp. 52–54].

Plaintiff believes there were disparate expectations between herself and Mr. Jones on the basis of their gender.  Plaintiff complained about these issues to Mr. Jones, Ms. Safar, and another part-time organizer [*Id.* at 18–19].  Specifically, plaintiff recalled incidents when Mr. Jones was unavailable or unwilling to participate in meeting preparation [*Id.* at 19–20].  In her deposition, she recalled that Mr. Jones did not participate in the "grunt work" involved in preparing for a meeting at the University of Memphis, and instead, he performed the "rather simple task" of picking up pizzas [*Id.* at 17–18, 22].

Plaintiff testified that she asked Ms. Safar for help because plaintiff felt that Mr. Jones was getting special treatment [*Id.* at 21].  Plaintiff also asked for a mediator who was skilled in intersectional issues, specifically race and gender, to mediate the issues she was having with Mr. Jones [*Id.* at 22].

---

Likewise, plaintiff claims that basic material facts have yet to be determined on this matter, including how, when, and who made the decision to change the date of the convention [*see, e.g.*, Doc. 54, p. 2].  But the Court similarly fails to see how these facts are legally relevant.

6

Ms. Safar then convened regular meetings between plaintiff and Mr. Jones beginning on or around September 18 [*Id.* at 23–24; Doc. 36-2, p. 11]. Ms. Safar facilitated the meetings and took notes, observing at one point that both plaintiff and Mr. Jones felt disrespected by one another [*see, e.g.*, Doc. 36-2, p. 11]. Ms. Safar also brought plaintiff's complaint about Mr. Jones, i.e., plaintiff's belief that she was subjected to different treatment than him because of her gender, to the Local's executive board [Doc. 36-4, p. 3]. Ms. Safar further informed the board of plaintiff's request to retain a third-party mediator to review and mediate plaintiff's complaint [*Id.*].

On November 17, Ms. Safar told plaintiff and Mr. Jones that the executive board decided to create a special committee to review the issues between them and wanted to meet with each of them [Doc. 36-1, pp. 27, 33, 35; Doc. 36-2, p. 23]. According to Mr. Smyser, the executive board took plaintiff's complaint[6] seriously and considered retaining a third-party mediator [Doc. 36-4, p. 3]. However, the board ultimately decided to form a special committee of member leaders to investigate and address plaintiff's complaint [*Id.*].

Plaintiff responded to Ms. Safar's email on December 7, stating her belief that her request for a mediator skilled in intersectional issues "seemed to [be] fair and reasonable. Especially when [Mr. Jones's] response was that he could not be sexist because he has a mother and wife and sisters" [Doc. 36-1, pp. 34–35; Doc. 36-2, p. 23]. She met with the

---

[6] Plaintiff testified that she did not register any other complaints about the conditions of her employment after she complained to Ms. Safar about Mr. Jones and until the special committee was formed [Doc. 36-1, p. 28]. Thus, based on plaintiff's deposition testimony and the record, it appears the executive board was aware only of plaintiff's complaint against Mr. Jones until she met with the special committee, and that the special committee was solely formed to investigate this matter.

7

special committee once in December and discussed her complaint about Mr. Jones and raised other issues, discussed further below [Doc. 36-1, pp. 25, 41; *see* Doc. 50, p. 10].

### D. The Civil Rights & Equity Committee Restructuring and Staff Meeting

In 2017, UCW Tennessee established the Civil Rights & Equity Committee (the "CREC") to operate on a statewide basis [Doc. 36-5]. However, involving members in the CREC's work and maintaining their participation proved to be a challenge [*Id.* at 1]. As a result, a CWA member leader and staff of the Local were asked to review the CREC's operation and make a recommendation for its future operation [*Id.*]. In November 2019, they produced a report recommending that the CREC be restructured from a single statewide committee to local committees [*Id.* at 1–2; *see also* Doc. 36-2, pp. 19–22]. The restructuring proposal, which was drafted before plaintiff was employed by the Local, was presented to the UCW member delegates at the September annual convention [Doc. 36-5, p. 2; Doc. 36-1, p. 32].

Plaintiff voiced her opposition to the CREC's reorganization at the convention and was the only staff member of the Local to do so [Doc. 36-1, pp. 45–47]. In her response to defendants' motion, plaintiff notes her belief that the proposed reorganization was racist and "white supremacist," which compelled her to speak out against it [*see, e.g.*, Doc. 50-10; Doc. 50, p. 16]. After plaintiff spoke, she testified that she did not recall anyone addressing her comments [Doc. 36-1, p. 48].[7]

---

[7] In her response, plaintiff suggests that "racial animus" was directed toward her at the convention itself but does not cite to proper summary judgment evidence in support of that assertion [Doc. 50, p. 17].

8

On September 29, the Local staff held a post-convention meeting at which plaintiff recalled feeling "attacked" and "ganged up on" for speaking up at the convention [*Id.* at 30, 48, 50, 52]. According to plaintiff, Mr. Jones said he was uncomfortable with plaintiff's remarks [*Id.* at 49, 51; *see also* Doc. 36-2, p. 13]. She further recalled that Mr. Jones said it was not his place to speak out and to address his opposition to the CREC at the convention because he was a staff person [Doc. 36-1, pp. 49, 51; Doc. 36-2, p. 13]. One staff member recalled opining that the convention was intended to be a space for members [Doc. 36-5, p. 2].[8] Other staff members agreed with Mr. Jones and said that plaintiff's remarks were "inappropriate, ill-timed, [and put them, i.e., the staff] in a bad light" [Doc. 36-1, pp. 49, 51]. Plaintiff generally recalled a back-and-forth among the staff saying that she should have addressed her concerns to the staff before raising them at the convention [*Id.* at 50–51].

At the same meeting, the staff decided to compile case studies of unions implementing racial justice programs for their discussions about confronting racial justice [*Id.* at 29–31, 37–38; Doc. 36-2, pp. 13, 16–18]. According to one staff member, the group decided that further discussion and education about racial justice and equity issues were needed and that they would adopt a curriculum on the issue for newly elected leaders and members [Doc. 36-5, pp. 2, 8].

---

[8] The meeting minutes further reflect that the staff discussed their role at conventions and whether the convention was "the platform to say what [the staff] thought or a space for members" [Doc. 36-2, p. 18].

At a meeting on October 19, plaintiff told the staff that she perceived their conduct toward her at the September 29 meeting as an attack, which "bled both racism and sexism," for her speaking out against racism at the convention [Doc. 36-2, pp. 13–14; Doc. 36-1, p. 48; Doc. 50-9].   According to the meeting minutes, it appears certain staff members acknowledged her sentiment and apologized, and Mr. Jones is cited as stating that he would never intentionally attack a black woman [Doc. 36-2, pp. 13–14].

###   E.   Plaintiff's Job Performance and Discharge

In July, the two West Tennessee staff organizers (i.e., plaintiff and Mr. Jones) recruited four new members in the Memphis area, with plaintiff bringing in at least two of the four [*Id.* at 27; Doc. 36-1, pp. 55–56;].   In August, three new members joined the Local from the University of Memphis, though plaintiff could not recall how they were recruited or if she recruited any of them [Doc. 36-1, p. 57; Doc. 36-2, p. 28].   In September, October, and November, plaintiff and Mr. Jones did not recruit any new members [Doc. 36-1, p. 57; Doc. 36-2, pp. 29–31].   In December, one new member joined in West Tennessee, but plaintiff could not recall if she was responsible for the recruitment or if the new member joined on his own [Doc. 36-1, p. 58; Doc. 36-2, p. 32].

Mr. Smith periodically reviewed the Local's organizing reports, which included statistics of how many new members the Local recruited [Doc. 36-3, p. 2].   He reviewed the reports to determine whether organizers whose positions were funded by CWA were achieving the organizing goals set forth in the Local's organizing proposal [*Id.* at 2].   Upon receiving the report on December 10, Mr. Smith noted that plaintiff and Mr. Jones failed to recruit any new members for a third straight month [*Id.* at 3].   He further observed that

neither Mr. Jones nor plaintiff ever met their organizing goals while they were employed [*Id.* at 2–3]. While he stated in an email that the report was "pretty awful," Mr. Smith noted that Mr. Stanfield "appear[ed] to be doing good work" [*Id.* at 4]. According to Mr. Smith, Mr. Stanfield organized 39 new members in East Tennessee out of a yearly goal of 50 in the same time period that plaintiff and Mr. Jones failed to meet their respective organizing goals [*Id.* at 3]. Mr. Smyser reiterated Mr. Smith's observations, namely that neither plaintiff nor Mr. Jones achieved their organizing goals during any month they worked for the Local [Doc. 36-4, p. 4].

According to Mr. Smith, because the West Tennessee organizers did not come close to meeting their organizing goals, he decided to withdraw the funding for those positions, which belonged to both plaintiff and Mr. Jones [Doc. 36-3, p. 2]. In turn, without CWA's funding, Mr. Smyser stated that the Local could not afford to continue employing plaintiff and Mr. Jones [Doc. 36-4, p. 4].

Plaintiff was terminated on December 22 [*Id.* at 4; Doc. 36-1, p. 59; Doc. 36-2, p. 33]. She was told that CWA informed the Local that (1) CWA was eliminating its funding for "all the organizer positions, effective immediately," and (2) that she had not met her organizing numbers in any month during her employment [Doc. 36-2, p. 33]. Plaintiff was offered four weeks' severance pay, contingent upon her signing a severance release [*Id.*]. Mr. Jones was also terminated [Doc. 36-4, p. 4].

## F.     The Instant Lawsuit

Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on October 25, 2021 [Doc. 51-1]. In her final charge

11

of discrimination dated January 14, 2022, plaintiff notes the following facts that constitute her sex, race, and religion discrimination and retaliation claims [Doc. 36-2, pp. 72–73]. First, the disparate nature of her job duties as compared to Mr. Jones's, who took "special privileges" by not participating in "grunt work" [*Id.* at 72]. Second, that plaintiff, a Christian, had a tense conversation with Mr. Smyser about the scheduling of the annual convention on the same date as Rosh Hashanah [*Id.*]. Third, the reorganization of the CREC [*Id.* at 72–73]. Fourth, the September 29 meeting at which she recalled being "lambasted" by staff for her calling the racial insensitivity and white supremacy of the CREC's reorganization at the convention [*Id.* at 73]. Fifth, her discharge [*Id.*].

Plaintiff received a "Determination and Notice of Rights" form from the EEOC on August 19, 2022 [Doc. 1, p. 14], and she initiated the instant lawsuit on November 17, 2022 [*see* Doc. 1]. Plaintiff alleges in her complaint that she was subject to discrimination and retaliation based on race, sex, and religion, in violation of Title VII of the Civil Rights Act of 1964 [*Id.* at 3]. Specifically, she brings (1) a race and sex discrimination claim, as she was subject to "disparate and harassing treatment" because of her race and sex; (2) a religious discrimination claim; and (3) a retaliation claim based on race, sex, and religion [*Id.* at 11–12].

At her deposition, plaintiff expressly confirmed that the above facts constitute the bases of the claims she brings in the instant lawsuit [Doc. 36-1, pp. 26, 60–65]. As to her retaliation claim, plaintiff testified that she was summarily fired instead of the special committee completing its investigation into the merits of her complaint and cites the severance agreement that was given to her upon her termination [*Id.* at 62–63]. Then, in

12

response to defendants' summary judgment motion, plaintiff clarifies that, in addition to the above, she believes the executive board's decision to investigate her complaints internally was discriminatory [Doc. 50, p. 16].[9]

Defendants filed their motion for summary judgment on February 9, 2024 [Doc. 34]. On February 12, plaintiff filed a motion for joinder [Doc. 37], which defendants oppose [Doc. 38]. Plaintiff did not respond within 21 days to defendants' summary judgment motion in accordance with the Court's local rules, but she filed an untimely motion for an extension of time respond on March 11, 2024 [Doc. 41]. The Court exercised its discretion and permitted an untimely response from plaintiff [Doc. 46]. Plaintiff then filed another motion for a brief extension [Doc. 47], which the Court granted [Doc. 49]. Plaintiff ultimately filed her response on April 20 [Docs. 50, 51], to which defendants timely replied [Doc. 52].

On May 15, 2024, plaintiff filed a motion for leave to file a surreply [Docs. 53, 54]. She contends that defendants' reply contains misrepresentations, and she attempts to clarify portions of her response [*Id.*]. The Court has considered her surreply in ruling on defendants' summary judgment motion below. Accordingly, plaintiff's motion for leave to file that surreply will be granted.

---

[9] To the extent that plaintiff perceived "deeper" issues beyond those cited above [*see, e.g.*, Doc. 50, p. 8], she does not explain what those issues are or point to record evidence in support of that contention. Nor does she explain how those issues are legally relevant to the claims she brings in this lawsuit. For instance, the Court notes that she claims that she was not merely expressing opposition to the CREC's reorganization at the convention, but that she "addressed the deeper issues embedded in, but revealed by, the *need* to restructure" the CREC [*Id.* (emphasis in original)].

13

## II. Plaintiff's Motion for Joinder

On February 12, 2024, plaintiff filed a Motion for Leave to Add Defendant Parties [Doc. 37]. Plaintiff seeks to join Mr. Smyser, Jane Doe, and John Doe of the Local, and Mr. Smith, Jane Doe, and John Doe of CWA, as party defendants pursuant to Federal Rules of Civil Procedure 20(a)(2), 15(a), and 21 [Doc. 37-1, p. 1].

Defendants respond in opposition [Doc. 38]. First, they note that plaintiff's motion is untimely. Under the Court's scheduling order, parties are required to file all motions for leave to amend the pleadings and add parties at least 150 days before trial date, which is scheduled for July 9, 2024, meaning that plaintiff should have filed her motion on or before February 9, 2024 [*Id.*; *see* Doc. 25, p. 6]. Plaintiff filed her motion on February 12, 2024, three days after the deadline. Even if her motion is not deemed untimely, defendants argue that it should be denied as futile, as plaintiff's attempt to amend her complaint to add new defendants does not relate back to her original complaint under Rule 15 [Doc. 38, p. 2]. As additional grounds for denying plaintiff's motion, defendants note that individuals cannot be sued under Title VII [*Id.*].

As an initial matter, plaintiff's motion does not acknowledge its untimeliness [*see* Doc. 37-1]. Nor does plaintiff set forth any good cause explanation for her failure to comply with the deadline included in the Court's scheduling order.

Moreover, plaintiff's attempt to join additional parties and amend her complaint to bring Title VII claims against them would be futile. Title VII prohibits "an employer" from discriminating against any individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[.]" 42 U.S.C. § 2000e–2.

14

"Employer" is defined as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such person[.]" 42 U.S.C. § 2000e(b). The Sixth Circuit has held that "an individual employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII." *Wathen v. General Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997). Thus, to the extent plaintiff seeks to assert Title VII claims against Mr. Smyser and Mr. Smith in their individual capacities (or any other Jane or John Doe supervisors or employees of CWA or the Local), Sixth Circuit case law instructs that she cannot do so.

To the extent plaintiff's motion can be construed as implicating her intent to sue Mr. Smyser and Mr. Smith (or any other John or Jane Joe supervisors or employees of CWA or the Local) in their official capacities, rather than their individual capacities, the Sixth Circuit has indicated in dicta that "there is support for the proposition that a supervisor may be held liable in his or her official capacity upon a showing that he or she could be considered the 'alter ego' of the employer." *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 362 n.2 (6th Cir. 2001). However, whether a plaintiff may pursue an official capacity claim under Title VII remains unresolved in the Sixth Circuit. *Monsul v. Ohashi Technica U.S.A., Inc.*, No. 2:08-cv-958, 2009 WL 2430959, at *2 (S.D. Ohio Aug. 6, 2009).

And, in addition to whether such an official capacity claim can be maintained, district courts in this circuit have also grappled with whether such official capacity claims could be asserted against private employer supervisors. *See Cautela v. Ohashi Tecnica U.S.A., Inc.*, No. 2:09-cv-960, 2009 WL 2431090, at *3 (S.D. Ohio Aug. 6, 2009) (noting

15

that there "is some support" for an argument that official capacity claims can only be asserted against public, and not private, employer supervisors, but declining to resolve that issue); *see also Dyer v. Radcliffe*, 169 F. Supp. 2d 770, 774 (S.D. Ohio 2001) (stating that "a public official can be sued under Title VII in his or her official capacity as an employer.").

Given that defendants have raised no argument about any attempt by plaintiff to sue Mr. Smyser and Mr. Smith (or any Jane or John Doe defendant) in their official capacities, the Court will not make a finding as to whether plaintiff may bring such claims against them. But the Court notes that "official capacity liability is simply another avenue for a plaintiff to establish liability on an employer." *Maudlin v. Inside Out Inc.*, No. 3:13-cv-354, 2014 WL 1342883, at *4 (S.D. Ohio Apr. 3, 2014). Accordingly, plaintiff's purported official capacity claims are, in actuality, a suit against the Local and CWA, who are already party defendants. Thus, the Court will deny plaintiff's motion to new defendants as parties in their individual and official capacities.

There is another problem with plaintiff's efforts to add new defendants to this lawsuit at this juncture. As defendants observe, plaintiff's attempt to join new defendants more than 18 months after receiving her notice of right to sue does not relate back to the filing of her complaint, and her claims against new defendants therefore are time barred [Doc. 38, p. 2].

A plaintiff seeking relief under Title VII must file suit within 90 days of receipt of a right to sue letter from the EEOC. *See* 42 U.S.C. § 2000e-(5)(f)(1); *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 557 (6th. Cir. 2000). Here, plaintiff

16

received a right to sue letter on August 19, 2022, and timely initiated her lawsuit against the Local and CWA on November 11, 2022 [Doc. 1, pp. 14–15].

Rule 15(c)(1)(C) of the Federal Rules of Civil Procedure governs the "relation back" of an amended complaint that "changes the party or the naming of the party against whom a claim is asserted." Fed. R. Civ. P. 15(c)(1)(C). But adding "a new party creates a new cause of action and there is no relation back to the original filing for purposes of limitations." *Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, 318 (6th Cir. 2010) (quoting *In re Kent Holland Die Casting & Plating, Inc.*, 928 F.2d 1448, 1449 (6th Cir. 1991)); *see also Lester v. Wow Car Co.*, 675 F. App'x 588, 592–93 (6th Cir. 2017) (affirming trial court's conclusion that claims against new defendants did not relate back to date of original pleading "[s]ince the New Defendants were added to the complaint and not even plausibly substituted for an original named defendant"). Only the substitution of a correct defendant for a misidentified party will relate back to the date of the original pleading if the requirements of Rule 15(c)(1)(C) are met. *See Reed v. U.S. Bancorp*, No. 1:12-cv-344, 2013 WL 1249231, at *5–7 (E.D. Tenn. Mar. 26, 2013).

Here, plaintiff's attempted addition of new defendants is a "substantive change in her case, not a technical correction to a pleading mistake." *See Johnson v. Baptist Mem'l Health Care Corp.*, No. 218CV02509SHMCGC, 2019 WL 5847850, at *6 (W.D. Tenn. Nov. 7, 2019). The defendants who plaintiff proposes to add "clearly are new parties, and not parties which were merely misnamed or misidentified." *Szoke v. United Parcel Serv. of Am., Inc.*, No. 1:03CV1628, 2006 WL 2792170, at *4 (N.D. Ohio Sept. 26, 2006). Plaintiff's request to join additional defendants and bring Title VII claims against them

17

more than 90 days after she received her right to sue letter does not relate back to the filing of her original complaint under Rule 15(c)(1)(C). Accordingly, Title VII claims against these defendants are time barred.

For all the above reasons, plaintiff's motion to join additional parties and amend her complaint will be denied.

## III. Plaintiff's Request to Defer Ruling on Summary Judgment

In response to defendants' motion, plaintiff asserts that further discovery in this case, i.e., taking the depositions of Mr. Smyser and Mr. Smith, is "necessary" to determine their motivations [Doc. 50, pp. 17–18]. Defendants construed plaintiff's statements as a "last-minute request for Rule 56(d) relief" under the Federal Rules of Civil Procedure and responded in opposition [Doc. 52, p. 11]. In her surreply, however, plaintiff clarifies that she does not ask the Court to defer ruling on their motion [*see* Doc. 54, p. 8].

In light of this clarification from plaintiff, the Court will not defer its ruling on defendants' summary judgment motion.

## IV. Standard of Review

Plaintiff's mere dissatisfaction with the summary judgment standard [*see* Doc. 50, pp. 12–13] does not allow this Court to evaluate defendants' motion under some other framework. Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party. *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

18

As such, the moving party has the initial burden of informing the court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003). The moving party can satisfy this burden by presenting affirmative evidence that negates an element of the nonmoving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Id.*

To successfully oppose a motion for summary judgment, "[t]he non-moving party . . . must present sufficient evidence from which a jury could reasonably find for him." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 940 (6th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A party opposing a Rule 56 motion has the duty to affirmatively present and point out *specific evidence in the record* sufficient to justify a jury decision in her favor. *See* Fed. R. Civ. P. 56(c)(1); *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989); *Anderson*, 477 U.S. at 256. The nonmoving party cannot simply rely on the mere allegations or denials contained in the party's pleadings. *Anderson*, 477 U.S. at 256. And merely alleging that a factual dispute exists cannot defeat a properly supported motion for summary judgment. *Id.* Further, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248; *see also McLemore v. Gumucio*, 619 F. Supp. 3d 816, 823 (M.D. Tenn. 2021).

Pleadings and documents filed by pro se litigants are to be "liberally construed," and a "pro se complaint, however inartfully pleaded, must be held to a less stringent

standard than formal pleadings drafted by lawyers." *Erickson*, 551 U.S. at 94 (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). However, "the lenient treatment generally accorded to pro se litigants has limits." *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996) (citing *Jourdan v. Jabe*, 951 F.2d 108, 110 (6th Cir. 1991)). District courts "have no obligation to act as counsel or paralegal" to pro se litigants and are not "required to create" a pro se litigant's claim for him. *Pliler v. Ford*, 542 U.S. 225, 231 (2004); *Payne v. Sec'y of Treasury*, 73 F. App'x 836, 837 (6th Cir. 2003).

Before considering defendants' motion, the Court makes the following observations. In opposing defendants' motion, plaintiff, at several points, relies on allegations in her complaint, which is not proper summary judgment evidence and cannot give rise to a genuine dispute of material fact [*see, e.g.*, Doc. 54, p. 3; Doc. 50, p. 8 n.3]. At times, she also relies on facts that are not in the record [*see, e.g.*, Doc. 50, pp. 8, 8 n.4, 17]. Finally, although plaintiff repeatedly argues that genuine disputes of material fact exist, many of these disputes, to the extent they actually exist, are not legally relevant, as described further *infra*.

## V. Analysis

Defendants initially argue that they are entitled to summary judgment on plaintiff's Title VII claims because plaintiff failed to exhaust her administrative remedies and they are not employers within Title VII's scope. In the alternative, they contend that plaintiff cannot overcome the undisputed facts that are material to her Title VII claims, warranting their dismissal and the dismissal of this case.

## A.     Sufficiency of the EEOC Charge

Defendants initially argue that plaintiff's Title VII claims must be dismissed because she failed to exhaust her administrative remedies before bringing suit [Doc. 35, pp. 16–17]. Plaintiff responds that she exhausted her administrative remedies [Doc. 50, p. 11], and filed proof of her charge of discrimination dated October 25, 2021 [*see* Doc. 51-1]. In reply, defendants note that plaintiff failed to produce the document she filed in response to their discovery requests, and that the document was not included in the EEOC's charge file [Doc. 52, pp. 2–3]. Nevertheless, they acknowledge that, viewing the evidence in a light most favorable to plaintiff, the document constitutes a timely filed verified charge [*Id.* 3]. Given this acknowledgement by defendants, the Court will proceed to evaluate the merits of plaintiff's Title VII claims.

## B.     Employer under Title VII

An employer is not subject to Title VII unless it has "fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b). The threshold number of employees is an element of a plaintiff's claim. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 (2006).

The Local argues that it is not an employer within the meaning of Title VII because it did not have 15 or more employees at all times relevant to the instant lawsuit [Doc. 35, pp. 15–16]. In support, it relies on Mr. Smyser's declaration in which he stated that the Local never employed more than six paid staff from 2017 through the end of 2020 [Doc. 36-4, p. 2]. Citing *Chavero v. Loc. 241*, 787 F.2d 1154 (7th Cir. 1986), the Local further argues that its eight executive board members were not employees within the meaning of

21

Title VII [Doc. 35, p. 16]. Assuming *arguendo* the board members were employees of the Local, the Local asserts that it would have employed only 14 employees (i.e., six staff and eight board members). Further, defendants argue that the Local, not CWA, was plaintiff's employer [*Id.* at 15].

Plaintiff disputes Mr. Smyser's statement that the Local did not employ more than six paid staff [Doc. 50, p. 3]. She cites the fact that CWA funded 75% of her salary in arguing against defendants' claim that the Local was her "sole and exclusive" employer [*Id.*]. She also has pointed to evidence of the interconnectedness between the Local and CWA [*Id.* at 1–2].

Defendants observe that plaintiff may be attempting to argue that she was jointly employed by both the Local and CWA [Doc. 52, p. 3]. The Sixth Circuit has recognized that "[e]ntities that do not otherwise meet the definition of employer (either because they do not formally employ the plaintiff or do not meet the numerosity requirement) may still face liability through the single-employer or joint-employer doctrines." *See Sanford v. Main St. Baptist Church Manor, Inc.*, 449 F. App'x 488, 491 (6th Cir. 2011) (citation omitted). Although plaintiff does not expressly cite to or rely on either doctrine in her pleadings or her response to defendants' motion, defendants do not present argument as to why they are not joint employers to carry their summary judgment burden. Instead, they contend that, in the event the Court construes the identity of her employer as disputed, defendants are still entitled to summary judgment because there are no genuine disputes of fact material to her substantive Title VII claims [Doc. 52, p. 3].

22

Case 3:22-cv-00410-TAV-JEM   Document 57   Filed 05/30/24   Page 22 of 42   PageID #: 885

Given this factual dispute that plaintiff has raised about the identity of her employer(s), and in light of defendants' lack of response, the Court finds it appropriate to proceed to merits of plaintiff's claims.

### C.    *McDonnell Douglas* Burden-Shifting v. Mixed Motives Theory

In assessing discrimination, retaliation, or hostile work environment claims under Title VII based on circumstantial evidence, courts may apply the *McDonnell Douglas*[10] framework. *Carden v. McDonough*, No. 2:19-CV-229, 2022 WL 989221, at *9 (E.D. Tenn. Mar. 31, 2022) (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007) (addressing the applicability of *McDonnell Douglas* to hostile work environment claims) and *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (addressing applicability of *McDonnell Douglas* to Title VII claims)). *McDonnell Douglas* establishes a three-step burden-shifting framework for analyzing employment discrimination claims. *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001). First, a plaintiff must set forth a *prima facie* case of discrimination or retaliation. *Id.* The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If the defendant carries this burden, the plaintiff must then show by a preponderance of the evidence that the reasons offered by the defendant were pretext for discrimination. *Id.*

Alternatively, plaintiffs can avoid summary judgment under a mixed motive theory by showing that race, color, or religion "was *a* motivating factor for the defendant's adverse employment action," and "even though other factors also motivated her discharge." *Griffin*

---

[10]  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

23

*v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012) (emphasis in original); *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 649 (6th Cir. 2012). *See also White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008) (holding "that the *McDonnell Douglas/Burdine* burden-shifting framework does *not* apply to our summary judgment analysis of Title VII mixed-motive claims") (emphasis in original). Specifically, to overcome a summary judgment motion, the plaintiff "need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) 'race, color, religion, sex, or national origin was *a* motivating factor' for the defendant's adverse employment action." *Williams v. Zurz*, 503 F. App'x 367, 375 (6th Cir. 2012) (emphasis in original) (quoting 42 U.S.C. § 2000e–2(m)). This burden is "not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *White*, 533 F.3d at 400.

Under the mixed motive theory, a plaintiff need not "eliminate or rebut all the possible legitimate motivations of the defendant" so long as plaintiff can demonstrate that "an illegitimate discriminatory animus factored into the defendant's decision." *Id.* at 401. "Nonetheless, this standard does require *some* evidence of discriminatory bias that has some connection to the adverse employment action." *Lopez v. Am. Family Ins. Co.*, 618 F. App'x 794, 800 (6th Cir. 2015) (emphasis in original) (citing *Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 429 (6th Cir. 2014)). Evidence establishing a mixed motive may be direct or circumstantial. *See Griffin*, 689 F.3d at 595. Thus, a plaintiff may demonstrate discriminatory bias by "proof that does not on its face establish discriminatory

24

animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009) (quotations omitted).

A plaintiff triggers mixed motive analysis by giving notice of her intent to proceed on the theory. *Spees v. James Marine, Inc.*, 617 F.3d 380, 390 (6th Cir. 2010); *see also Bartlett v. Gates*, 421 F. App'x 485, 488 n.1 (6th Cir. 2010) (explaining that the mixed motive standard "only applies when plaintiffs provide notice of mixed motive claims"). A plaintiff can invoke the mixed motive analysis either expressly or impliedly through use of the motivating factor test in her complaint and responsive pleadings. *Ondricko*, 689 F.3d at 649.

It is not entirely clear whether a plaintiff, particularly one proceeding pro se, may properly raise the mixed motive theory for the first time in response to a summary judgment motion without previously attempting to plead or raise the theory in previous filings. *See, e.g.*, *Spees*, 617 F.3d at 390 (explaining that the plaintiff gave adequate notice of mixed motive claim by alleging pregnancy was a motivating factor in her complaint and specifying she was bringing mixed motive claims in a footnote in her motion for summary judgment). *But see Wheeler v. City of Columbus*, No. 2:16-CV-1159, 2019 WL 3753579, *8 (S.D. Ohio Aug. 8, 2019) (explaining that a plaintiff "cannot present a mixed-motives theory for the first time in her response to a summary judgment motion"); *Shoemaker v. ConAgra Foods, Inc.*, 219 F. Supp. 3d 719, 738 (E.D. Tenn. 2016).

In response to defendants' motion, plaintiff presents alternatives to *McDonnell Douglas*, including the mixed motive theory and a so-called "sufficiency of the evidence"

standard[11] [Doc. 50, pp. 14–15].  Consequently, the Court initially construed plaintiff's response as an attempt to raise the mixed motives theory.[12]  But in her recently filed surreply [Doc. 54, p. 5], plaintiff clarifies that she does not intend to use the mixed motive theory.  Or *McDonnell Douglas* for that matter [*Id.* at 9–10].  Instead, she argues for a "sufficiency of the evidence" standard [*Id.* at 10].  But this standard is not the law.  Further, that *McDonnell Douglas* has been criticized does not permit this Court to depart from it and apply something else without any legal force.

Despite plaintiff's desire that neither *McDonnell Douglas* nor the mixed motives analysis apply here, the Court nevertheless must proceed and apply applicable law, i.e., *McDonnell Douglas* and/or the mixed motives theory, to evaluate her claims.  Regardless of which theory is applied here, the Court concludes that plaintiff's Title VII claims warrant dismissal.

### D.     Sex Discrimination

To establish a *prima facie* case of sex discrimination under *McDonnell Douglas*, plaintiff must demonstrate that "(1) she is a member of a protected group, (2) she was subjected to an adverse employment action, (3) she was qualified for the position, and

---

[11] Plaintiff cites to a 2008 law review article in which the author apparently critiques *McDonnell-Douglas* [Doc. 50, p. 15].

[12] Plaintiff only cursorily refers to the mixed motives theory for the first time in response to defendants' motion.  Indeed, she did not expressly plead the theory.  And in liberally construing her complaint, it does not appear that she attempted to give notice of her intent to raise the theory by implication.  *See Ondricko*, 689 F.3d at 649.  To the contrary, she has expressly disclaimed her intent to raise the theory in her surreply [Doc. 54, p. 5].  As a result, the Court is unconvinced that plaintiff has properly given notice of her intent to trigger the mixed motives theory.  *See Shoemaker*, 219 F. Supp. 3d at 738.

26

(4) similarly situated non-protected employees were treated more favorably." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016) (internal quotation marks and citations omitted).

An adverse employment action is "a materially adverse change in the terms and conditions of a plaintiff's employment." *Spees*, 617 F.3d at 391 (internal citation and quotations omitted). "Adverse employment actions are typically marked by a 'significant change in employment status,' including 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* (quoting *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 798 (6th Cir. 2004) (en banc) (internal citations omitted)).

The primary bases for plaintiff's sex discrimination claim appears to be what she refers to as "disparate expectations and treatment" of Mr. Jones and her subsequent discharge [Doc. 1, pp. 5–6]. In response to defendants' motion, plaintiff appears to attempt to clarify that her claim encompasses other events, including, the post-convention staff meeting at which staff "attacked" her, and the decision of the executive board to investigate plaintiff's complaints about race and gender internally, as opposed to onboarding a third-party mediator skilled in intersectional issues [Doc. 50, p. 16].

That Mr. Jones did not perform "grunt work" on certain occasions is not an adverse employment action because plaintiff has not demonstrated that it amounted to "a materially adverse change in the terms and conditions of [her] employment." *See Spees*, 617 F.3d at 391 (quotation and alterations omitted). For the same reason, that plaintiff felt attacked by

27

staff after speaking up at the convention, or that the executive board decided to investigate plaintiff's complaint internally, do not constitute adverse employment actions. *See id.*

Plaintiff's discharge, however, clearly constitutes an adverse employment action. But her sex discrimination claim nevertheless fails because there is no evidence that a similarly situated non-protected employee was treated more favorably than she was. *See Jackson*, 814 F.3d at 776. In fact, the evidence is to the contrary: Mr. Jones, a male, received the same treatment as plaintiff. Mr. Jones was discharged at the same time and for the same reasons as plaintiff—that is, that CWA pulled the funding for both their positions because they both failed to meet their organizing goals [Doc. 36-3, p. 2; Doc. 36-4, p. 4]. After that, the Local could not afford to employ either plaintiff or Mr. Jones [*Id.*].

Likewise, to the extent plaintiff can properly assert the mixed motives theory, she has presented no evidence, either direct or circumstantial, that her gender played any role either in CWA's decision to withdraw funding for her salary or the Local's decision to discharge her. Accordingly, plaintiff's sex discrimination claim will be dismissed.

### E. Religious Discrimination

As to plaintiff's religious discrimination claim, defendants observe that it is unclear whether plaintiff intends to proceed on a failure to accommodate or disparate treatment theory [Doc. 35, p. 14].

Plaintiff bases her religious discrimination claim on the scheduling of the annual convention, which conflicted with the observance of the Rosh Hashanah holiday [Doc. 1, p. 7; Doc. 50, p. 18]. Plaintiff, who is not of the Jewish faith but is a practicing Christian,

28

learned that other staff members attempted but failed to convince Mr. Smyser to change the convention date and were upset [Doc. 36-1, pp. 7–11]. Accordingly, plaintiff, in an attempt to appeal to Mr. Smyser as a "fellow Christian," discussed the matter with him [*Id.* at 11–13]. Following what plaintiff describes as a "very tense" conversation, the convention was rescheduled so as to not conflict with the Jewish holiday [*Id.* at 12; Doc. 36-4, p. 3].

To establish a *prima facie* case of failure to accommodate, plaintiff must show that she (1) holds a sincere religious belief that conflicts with an employment requirement; (2) informed the employer about the conflict; and (3) was discharged or disciplined for failing to comply with the conflicting employment requirement. *Bolden v. Lowes Home Ctr's, LLC*, 783 F. App'x 589, 597 (6th Cir. 2019). If an employer can show that it offered an employee a reasonable accommodation, the employer has discharged its statutory duty. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68–69 (1986).

In a claim for disparate treatment, plaintiff has the initial burden of establishing a *prima facie* case that her employer discriminated against her because of her religion. *Beaven v. Commonwealth of Kentucky*, 783 F.2d 672, 675 (6th Cir. 1986). In cases of circumstantial evidence, plaintiff must show (1) she was a member of a protected group; (2) she was subject to an adverse employment decision; (3) she was qualified for the position; and (4) similarly situated non-protected employees were treated more favorably. *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995).

A plaintiff raising a religious discrimination claim must demonstrate it was the "*religious* aspect of her [conduct] that motivated her employer's actions," i.e., the

termination of her employment. *Pedreira v. Ky. Baptist Homes for Child., Inc.*, 579 F.3d 722, 728 (6th Cir. 2009) (emphasis in original) (quoting *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 627 (6th Cir. 2000)). This is so regardless of whether the plaintiff frames her claim as disparate treatment or failure to accommodate. *Prida v. Option Care Enter., Inc.*, No. 5:23-CV-00905, 2023 WL 7003402, at *3 (N.D. Ohio Oct. 24, 2023).

Plaintiff argues that she, as a Christian, has standing to make a claim of disparate treatment on behalf of the Jewish staff [Doc. 50, p. 18]. She claims she need not be a member "of a protected class to make a claim of discrimination," and contends that she is injured by discriminatory treatment against any other religious group [*Id.*].

In certain circumstances, the Supreme Court has ruled that a third party can initiate a charge of discrimination on behalf of an aggrieved individual and has standing to sue. *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 176–78 (2011); 29 C.F.R. § 1601.7. But here, defendants do not challenge plaintiff's standing. Rather, they contend she has not made out a *prima facie* case of religious discrimination.

The Court agrees that plaintiff has failed to make out a *prima facie* case of religious discrimination, whether that be under a reasonable accommodation or disparate treatment theory, or mixed motives theory.

Plaintiff has not demonstrated that she held a sincere religious belief that conflicted with any employment requirement. *See Bolden*, 783 F. App'x at 597. As defendants observe, because plaintiff is not Jewish, there is no evidence of any conflict with her own religious practice or failure to accommodate her religion [Doc. 35, p. 22]. Likewise, there is no evidence that she was discharged for failing to comply with any conflicting

30

employment requirement. *See id.* Nevertheless, the convention was ultimately rescheduled. Assuming *arguendo* plaintiff could make out a *prima facie* case, defendants properly frame the rescheduling of the convention as an accommodation of religiously observant Jewish employees' religious practices, a fact which plaintiff does not dispute [*Id.* at 22; *see also* Doc. 54, p. 3].[13] *See Ansonia Bd. of Educ.*, 479 U.S. at 68–69.

Moreover, plaintiff has not come forward with any evidence that would suggest she was discriminated against for any sincerely held religious beliefs. That the convention was originally scheduled during the Jewish holiday, albeit ill-timed, does not in and of itself constitute circumstantial evidence of religious discrimination, even construing that fact in a light most favorable to plaintiff. Nor is the mere fact that Mr. Smyser originally was reluctant to change the date of the convention, as there has been no evidence presented that he harbored any discriminatory animus based on religion [*see* Doc. 36-1, p. 14].

Most importantly, under any potential theory, including the mixed motives theory, plaintiff has not proffered any evidence demonstrating that a "religious aspect of her [conduct] . . . motivated" either CWA's decision to withdraw funding for her salary or the Local's subsequent decision to discharge plaintiff nearly three months after she complained about the scheduling conflict to Mr. Smyser. *See Pedreira*, 579 F.3d at 728 (quoting *Hall*, 215 F.3d at 627)).

Therefore, plaintiff's religious discrimination claim will be dismissed.

---

[13] Plaintiff complains that it remains unclear "what, when and how" the Local's leadership decided to accommodate the observance of Rosh Hashanah [*see, e.g.*, Doc. 54, p. 3]. While plaintiff may wish to discover those details, they are not legally relevant to the Court's analysis under applicable law.

31

## F.    Race Discrimination

To establish a *prima facie* case of race discrimination under *McDonnell Douglas*, plaintiff must demonstrate that:

> 1) she is a member of a protected class; 2) she was qualified for his job and performed it satisfactorily; 3) despite her qualifications and performance, she suffered an adverse employment action; and 4) that she was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside her protected class.

*Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572–73 (6th Cir. 2000).

It appears the bases of plaintiff's race discrimination claim include (1) the disparate treatment she perceived between herself and Mr. Jones; (2) the restructuring of the CREC, which she believed was "racially insensitive and white supremacist;" (3) the post-convention meeting where plaintiff claims she was attacked by staff for speaking out at the convention about the CREC's reorganization; (4) the executive board's decision to investigate plaintiff's complaints internally, instead of hiring an outside mediator skilled in race and gender issues; and (5) plaintiff's discharge [Doc. 50, p. 16]. Plaintiff also argues that defendants "obfuscate" issues about race that she alleges in her complaint, and claims there were "deeper issues" revealed by the decision to restructure the CREC [*Id.* at 8, 17]. Aside from these conclusory assertions, plaintiff does not point to concrete evidence explaining what those issues were or how they are relevant to her race discrimination claim, including how they motivated defendants' decision to terminate her employment [*Id.*].[14]

---

[14] For example, plaintiff also suggests that there was "racial animus" directed at her at the convention after she spoke, but she does not point to specific evidence in the record that would support that assertion [Doc. 50, p. 17]. In fact, it appears that she relies on allegations in her complaint, which, as discussed *supra*, is improper summary judgment evidence [*Id.* at 8 n.3].

32

As an initial matter, and as discussed in the context of plaintiff's sex discrimination claim, only plaintiff's discharge constitutes an adverse employment action, which clearly is "a materially adverse change in the terms and conditions of [her] employment." *See Spees*, 617 F.3d at 391 (quotation and alterations omitted). Plaintiff has not proffered evidence or explained how the other circumstances that she cites as part of her race discrimination claim constitute adverse employment actions.

Thus, at issue here is whether plaintiff was treated less favorably than a similarly situated individual outside her protected class upon her discharge. This means that plaintiff must proffer a proper comparator who is similarly situated to her in "all *material* respects." *See Benitez v. Tyson Fresh Meats, Inc.*, No. 3:18-CV-491, 2022 WL 1283087, at *44 (M.D. Tenn. Apr. 28, 2022) (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)) (emphasis in original). Plaintiff must demonstrate "a specific and close match" between her circumstances and those of her proposed comparator. *Id.* Indeed, "this bar is not a low one." *Id.*

Defendants argue that plaintiff cannot prove that she was treated differently than a similarly situated white employee [Doc. 35, p. 22]. They observe that Mr. Stanfield, a white organizer in East Tennessee whose position was also funded by CWA, is not a proper comparator [*Id.*]. Unlike plaintiff and Mr. Jones, CWA did not pull funding for Mr. Stanfield's position, and Mr. Stanfield was not similarly discharged. In support, defendants point to Mr. Smith's declaration in which he stated that Mr. Stanfield organized 39 new members out of a yearly goal of 50 in the same timeframe that plaintiff and Mr. Jones collectively organized under 10 individuals out of a yearly goal of 100 [*Id.* at 22–23; Doc.

33

36-3, p. 3; Doc. 36-2, pp. 27–32]. Plaintiff does not dispute the above or contend that Mr. Stanfield is, in fact, similarly situated to her.

Accordingly, the Court finds that defendants have shifted the burden to plaintiff to identify a proper comparator (or demonstrate her ability to do so at trial). *See id.* at \*34. However, she has made no such showing in her response to their motion.

Finally, to the extent that plaintiff has properly asserted a claim of race discrimination under the mixed motive theory, she has not pointed to evidence, either direct or circumstantial, such that a reasonable jury could find that her discharge was motivated in part by her race. First, that plaintiff vocally opposed the restructuring of the CREC, believed the restructuring itself was racist, and complained about what she perceived as other "deeper issues" is not evidence that her subsequent discharge was motivated in part by her *own* race [Doc. 50, p. 8]. As to the latter, plaintiff has not pointed to any competent evidence of what those "deeper issues" were and how they motivated either CWA's decision to withdraw funding for her position or the Local's decision to discharge her.

Second, plaintiff does not explain how the staff's criticism of her speaking out at the convention, which she perceived as racist and sexist [Doc. 50-10], played any role in the circumstances surrounding her discharge. Even viewing the evidence in a light most favorable to plaintiff, no reasonable juror could conclude that the staff's criticism of her was motivated in part by her race and therefore constitutes evidence that her later discharge likewise was motivated by her race.

Third, the Court fails to see how the executive board's decision to investigate plaintiff's complaint internally as opposed to hiring a third-party mediator trained in

34

intersectional issues is evidence that her discharge was motivated in part by her race.  In sum, the Court concludes that there is no evidence in the record that demonstrates any "discriminatory bias that [had] some connection to" plaintiff's discharge.  *Lopez*, 618 F. App'x at 800 (citation omitted).

Accordingly, plaintiff's race discrimination claim will be dismissed.

### G.     Hostile Work Environment

To establish a hostile work environment claim, a plaintiff must demonstrate that she (1) is a member of a protected class; (2) was subjected to unwelcomed harassment; (3) the harassment was based on the protected class; (4) the harassment created a hostile work environment; and (5) the employer "failed to take reasonable care to prevent and correct" any harassing behavior.  *See Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462–63 (6th Cir. 2000).[15]  This standard is "markedly different" from the one applied to harassment by supervisors.  *Blankenship v. Parke Care Ctrs., Inc.*, 123 F.3d 868, 873 (6th Cir. 1997).  "[T]he employer can be liable only if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known."  *Id*.  "The elements and burden of proof [in a hostile work environment claim] are the same, regardless of the discrimination context in which the claim arises."  *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999) (internal quotation marks omitted)).

"Appropriate factors for the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment 'include the frequency

---

[15]  The mixed motives theory does not apply to hostile work environment claims.  *Catron v. Eastman Chem. Co.*, No. 2:15-CV-169, 2016 WL 7165734, at *12 (E.D. Tenn. Dec. 7, 2016).

35

of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Bowman*, 220 F.3d at 463 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Likewise, the conduct complained of "must be extreme to amount to a change in the terms and conditions of employment," *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), and "simple teasing . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (quotations omitted).

This test is both objective and subjective: the conduct must be sufficiently severe or pervasive to create "an environment that a reasonable person would find hostile or abusive" and the complainant must actually find the environment to be hostile or abusive. *Bowman*, 220 F.3d at 463. In assessing whether the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment, the court considers the totality of the circumstances. *Harris*, 510 U.S. at 23 ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances"). Finally, the "pervasive" or "severe" standard "sets a high bar for plaintiffs in order to distinguish meaningful instances of discrimination from instances of simple disrespect." *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 485 (6th Cir. 2020).

Defendants argue that plaintiff's hostile work environment claim fails in part because any harassment she experienced was neither severe nor pervasive [Doc. 52, p. 9].

Plaintiff does not address or mention her hostile work environment claim or explain the basis for any claim in her response [*see* Doc. 50].[16]  The factual basis for her hostile work environment claim is not entirely clear based on her complaint, as she generally alleges that she experienced harassing treatment on the basis of her race and sex [Doc. 1, p. 11].  As an initial matter, the Court observes that it is "not required to conjure up questions never squarely presented to them or to construct full blown claims from sentence fragments" on behalf of pro se parties.  *Fowler v. Marous Bros. Const.*, No. 1:07 CV 531, 2007 WL 1169297, at *1 (N.D. Ohio Apr. 18, 2007) (citing *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985)).  To do so would "require . . . [the courts] to explore exhaustively all potential claims of a pro se plaintiff, . . . [and] would . . . transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party."  *Id.* (quoting *Beaudett*, 775 F.2d at 1278).

Nevertheless, the Court has liberally construed the allegations in plaintiff's complaint and concludes that none of the conduct of which plaintiff complains, in the totality or individually, constitutes a hostile work environment.

As an initial matter, to the extent that plaintiff wishes to argue that her discharge is the basis for her hostile work environment claim, adverse employment actions like a termination is "not in the nature of harassment in the form of intimidation, ridicule, or

---

[16]  The Court observes that it is not even clear if plaintiff seeks to bring a hostile work environment claim in the first place, as her complaint alleges "harassing treatment" under Count 1 [Doc. 1, p. 11].

37

insult" and is not considered part of a hostile work environment claim. *See Ogbonna-McGruder v. Austin Peay State Univ.*, No. 3:21-CV-00506, 2023 WL 3572891, at \*9 (M.D. Tenn. May 19, 2023).

Further, that plaintiff was personally impacted by her workplace situation is not enough to survive summary judgment here [*see* Doc. 50, p. 9; Doc. 54, p. 6]. As explained above, the law requires a work environment to be both subjectively and objectively hostile to sustain a hostile work environment claim.

For instance, plaintiff felt "attacked and lambasted" by staff after she opposed the restructuring of the CREC at the convention [Doc. 50, p. 16; *see also* Doc. 36-1, p. 50]. She testified that she recalled that Mr. Jones and other staff expressed their belief that her comments were "inappropriate, ill-timed, [and put them] in a bad light" [Doc. 36-1, pp. 49, 51; *see also* Doc. 36-2, p. 13]. She further testified that she thought Mr. Jones said it was not his place to address his opposition to the CREC at the convention because he was a staff person, and she was told that she should have voiced her concerns first to the staff [Doc. 36-1, p. 51].

Based on the record, however, no reasonable juror could find that the staff's criticism of plaintiff was objectively harassing. That plaintiff later informed the staff that she subjectively perceived their comments as attacks that "profusely . . . [bled] both racism and sexism"[17] is not objective evidence to support a hostile work environment claim based on sex or race [Doc. 50-10, Doc. 36-2, pp. 13–14].

---

[17] Aside from plaintiff's subjective perception of the situation, there is no evidence or innuendo that their criticism was motived by any racial or sexist animus.

Defendants also cite to plaintiff's allegation that Mr. Jones did not participate in "grunt work" and was generally "taking special treatment," but argue that such evidence does not rise to the level of severe or pervasive harassment on the basis of her sex [Doc. 35, p. 20]. That plaintiff may have perceived Mr. Jones as a slacker and that she struggled to establish a professional working relationship with him is not objective evidence of a hostile work environment. Likewise, it cannot be seriously contended that defendants "manifest[ed] indifference or unreasonableness" in handling plaintiff's complaint about Mr. Jones. *See Blankenship*, 123 F.3d at 873. Initially, plaintiff's supervisor attempted to informally resolve the problems between plaintiff and Mr. Jones [Doc. 36-1, pp. 23–24; Doc. 36-2, p. 11]. Further, although not plaintiff's preferred result, a special committee was formed to investigate her complaint after considering plaintiff's request for a third-party mediator [Doc. 36-2, p. 23; Doc. 36-1, pp. 27, 33, 35; Doc. 36-4, p. 3].

At bottom, none of the incidents about which plaintiff complains were physically threatening or objectively humiliating such that they amount to severe racial harassment or harassment on the basis of sex, either individually or collectively. *See Singleton v. PSA Airlines, Inc.*, No. 21-3423, 2022 WL 875869, at *3 (6th Cir. Mar. 24, 2022) (comparing case to *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 513 (6th Cir. 2011)). Accordingly, plaintiff's hostile work environment claim will be dismissed.

## H. Retaliation

A *prima facie* case of Title VII retaliation requires plaintiff to show "(1) [she] . . . engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against the

employee, and (4) there was a causal connection between the protected activity and the adverse employment action." *Laughlin v. City of Cleveland*, 633 F. App'x 312, 315 (6th Cir. 2015) (internal quotation marks omitted) (citing *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008)).[18] At the prima facie stage, the plaintiff's burden "is not onerous," and can be met through "evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights." *George v. Youngstown State Univ.*, 966 F.3d 446, 460 (6th Cir. 2020) (internal quotation marks omitted) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).

Plaintiff alleges that defendants took adverse action against her because of her "actions opposing race, sex, and religious discrimination" [Doc. 1, p. 12]. Defendants argue that plaintiff cannot prove a causal connection between her protected activity (i.e., her complaints opposing race, sex, and religious discrimination) and her discharge [Doc. 35, p. 23]. Plaintiff's response to defendants' motion is largely devoid of any argument about her retaliation claim [*see* Doc. 50].

To establish causation, Title VII plaintiffs must show that their "protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 349, 362 (2013). In other words, plaintiff "must prove

---

[18] The mixed motive theory does not apply to claims for retaliation. *See, e.g.*, *Hawkins v. Ctr. for Spinal Surgery*, 34 F. Supp. 3d 822, 837 (M.D. Tenn. 2014) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013) ("The text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.")).

40

that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.* at 360. "An intervening cause between the protected activity and an adverse action dispels any inference of causation." *Jones v. Vilsack*, 861 F. App'x 58, 61 (6th Cir. 2021) (citation omitted); *see also Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012) (holding that an oil rig worker who had complained about sexual harassment to his superiors, but who subsequently left his worksite without authorization, had engaged in an intervening event that gave his employer a legitimate reason to discipline him).

It is undisputed that the Local discharged *both* plaintiff and Mr. Jones after CWA withdrew funding for their positions based on their failure to meet their organizing goals [Doc. 36-3, p. 2]. After CWA withdrew its funding, the Local could not afford to continue employing plaintiff and Mr. Jones, and both were discharged at the same time [Doc. 36-4, p. 4]. Therefore, it cannot be said that plaintiff was treated differently from a similarly situated employee.

In soliciting funding from CWA for the two West Tennessee organizing positions that belonged to plaintiff and Mr. Jones, it is undisputed that the Local proposed an organizing goal of 10 new members per month and a total of 100 new members for the upcoming year [*Id.* at 2; Doc. 36-2, p. 8]. Although plaintiff was not aware, CWA conditioned funding for those positions on the organizers meeting those performance goals [Doc. 36-3, p. 2].[19] Plaintiff's offer letter likewise included a goal that she should aim to

---

[19] Plaintiff claims she was unaware of this employment requirement, which she believes amounts to a genuine dispute of material fact [Doc. 50, p. 4; Doc. 54, p. 4]. However, plaintiff

recruit 15 members per month [Doc. 36-2, p. 1]. It is undisputed that neither plaintiff nor Mr. Jones came close to meeting these goals during their approximately six-month employment [Doc. 36-2, pp. 29–32; Doc. 36-3, pp. 3–4]. In fact, it appears that they recruited under 10 individuals from July to December [Doc. 36-2, pp. 27–32]. Meanwhile, their counterpart in East Tennessee organized 39 individuals out of a yearly goal of 50 in the same time period [Doc. 36-3, p. 3].

Such intervening conduct by plaintiff (and Mr. Jones)—i.e., their failure to come close to meeting their organizing goals—is sufficient to dispel any inference of causation here and constitutes an intervening reason for her discharge. *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 628 (6th Cir. 2013). As a result, plaintiff's retaliation claim will be dismissed.

## VI. Conclusion

For the reasons above, defendants' motion for summary judgment [Doc. 34] is **GRANTED**, and plaintiff's motion for joinder [Doc. 37] is **DENIED**. Plaintiff's motion for leave to file a surreply [Doc. 53] is **GRANTED**, and defendants' motion to continue trial [Doc. 56] is **DENIED as moot**. This case will be **DISMISSED**. A separate order will enter.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

---

fails to articulate why her lack of knowledge is material, particularly in light of the other undisputed facts (i.e., that neither she nor Mr. Jones met their performance goals during their employment) and applicable law.

42